OPINION OF THE COURT
Phylis Skloot Bamberger, J.
*381 The defendant is charged with criminal possession of a controlled substance in the third degree. The defendant made a pretrial motion to suppress drugs and other items found in the room that was his home. The hearing was held on October 11, 1996, November 22, 1996, December 18, 1996, and February 21, 1997.[1] Detectives John Porette and Thomas Gervase testified for the People and Luz Ibarra testified for the defense. The motion is granted.
This opinion sets out the findings and conclusions of the court.
TESTIMONY
The defendant seeks suppression of evidence seized after a search of his home on March 24, 1995. The events resulting in the seizure began at about 6:30 a.m. Detectives Porette and Gervase were part of a team of six police officers from the New York City warrant squad. The officers entered the dwelling at 4440 Park Avenue asserting their authority to do so rested on three bench warrants. As a result of the observations they made when they entered the rooms that were individual residences in that dwelling, the detectives obtained a search warrant and pursuant to that warrant seized the drugs and drug paraphernalia from the defendant’s room. These items became the basis of the charges filed against the defendant. Neither Porette nor Gervase had previously been at the house to execute those warrants.
1. The Telephone Call
Gervase testified that on or before March 22, 1995, someone in his unit of about 100 officers had received a telephone call in which the caller said that a person who the police "were looking for” was at 4440 Park Avenue. Gervase also said that the message was that the person was "living” at 4440 Park Avenue. Gervase did not know who received the call, who made the call, how the person who called knew the information relayed in the call or the exact date of the call.[2] No record or report of the call was made by Gervase because he was not the *382 person who received the call, and he never tried to find out who in the unit had received the call. Further, his memo book was lost so any notes he might have made were unavailable.
2. The Three Bench Warrants
Gervase testified he put the address, 4440 Park Avenue, into the police computer and came up with the names of three people with outstanding warrants who had given 4440 as their address. The three names were placed in the police computer and the police department warrant entry printouts came up disclosing warrant numbers and dates of issuance of the warrants, case complaint numbers, the NYSIS numbers and pedigree information about the three people. The warrants were then entered into the court computer, which disclosed that all the warrants were active. According to Gervase, all three warrants were issued for black males charged with misdemeanors or violations, and he had no knowledge of what work had been done to execute them because misdemeanor warrants were processed through local precincts and there was no computer access to that information. Only one of the original warrants was in the possession of the police. Similarly, the police had a photograph of only one of the people named in the warrant.
According to the evidence at the hearing, one warrant had been issued for Milard Seabrook on March 11, 1976, 19 years earlier. Despite his prior testimony, Gervase testified he did not remember whether he checked to see if this warrant was active by referring to the computer or by calling the court clerk. Although the police department warrant entry printout showed Seabrook had been charged with a felony, burglary in the third degree (Penal Law § 140.20), the warrant was designated "C”, that is for a misdemeanor,[3] and, as noted, Ger-vase said the warrant was for a misdemeanor.
The criminal court file in Seabrook’s case[4] shows that on February 11, 1976, he pleaded guilty to trespass, a violation as defined in Penal Law § 140.05, and was sentenced on that date *383 to serve five days in jail or pay $25 by March 11, 1976. The warrant used by Gervase was the warrant issued on March 11, 1976, apparently for the failure to pay the $25.
The second bench warrant was for Lorenzo Williams and was issued on December 12, 1988, some seven years before the events here. Williams was charged with a petit larceny, a class A misdemeanor (Penal Law § 155.25). In an investigation on October 19, 1988, of an unrelated felony warrant issued against Williams earlier in 1988, the warrant squad learned that Williams had an address at 681 Cortlandt Avenue, that William’s mother had a telephone number, and that the son of the owner of 4440 Park Avenue stated that Williams did live at the building, but that he might at that time be in jail. This warrant was resolved and was not open. This information was available to Gervase when he looked in the police computer.
The final bench warrant was for Jonathan Bonner and was issued on September 30, 1988, for possession of marijuana, a violation (Penal Law § 221.05).
Gervase testified that no investigation was undertaken to update the information from the computers, no checking with neighbors or surveillance was done. He said no contact was made with utility companies or the post office because it would take too long to get results. Gervase did not recall checking with State Department of Corrections; he did not remember checking three NYSIS members for updated information. At first, Gervase said that he would have made entries about NYSIS checks in his memo book, then he said that he did not have his memo book and then said he would not have put the entries in the book if there were negative results.
3. Execution of the Bench Warrants
a. The Structure of 4440 Park Avenue
The layout of the building was as follows. From the street were stairs to the front door of the building. Just inside the door was a little hallway with two more doors. One, to the right, led to the stairs to the second floor; the other, to the left, led into the first floor where there was a hallway. On the right side was the wall of the hall; on the left were three or four rooms. Gervase said each had a lock and a number. Off the hallway was a bathroom and a kitchen.
b. Entry of the Police into the Building
Gervase and the other members of the team got to the building at about 6:30 a.m. on March 24, 1995. Gervase knew the *384 building was a private dwelling; but before entering, he did not know it was a series of single rooms in which people resided.
Porette and another detective went to the rear of the building by climbing over a fence and took up their positions to prevent anyone from leaving the building. Gervase and two other detectives knocked on the front door of the building. The defendant looked out of the window. Gervase could immediately see that the defendant was not black and was therefore not one of the people subject to the warrant. The officers identified themselves and the defendant came to the front door and let them in. The defendant appeared to have been awakened from sleep and was in some sort of sleepwear.
The detectives told the defendant that they had active warrants on three people. They had with them only the warrant for Williams, but there was no evidence that they showed it to the defendant. Gervase asked the defendant his name and he told them. The detectives told the defendant the names of the three people for whom they were looking and showed him the one photograph. The defendant said that he did not know any of the people and they did not live there.
The detectives told the defendant that they had to come in and look around. From the front door the officers could not see the defendant’s room nor did they hear any scurrying around. As Gervase described it, the officers "entered the private house”. The defendant’s room was the first one on the left and his door was open. The detectives followed him inside. His wife was asleep in the bed, and the officers knew that she was not one of the people for whom they were looking. Once in the room, Gervase saw on his left a dresser on which were plastic bags, one with vials and the other with blue caps for the vials. The defendant was arrested.
Porette entered the building after other detectives were inside and one of them opened the back door of the building. Just inside the back door was an open area leading to the kitchen of the house. There was a man sleeping there; Porette awakened him and took him to the defendant’s room.
The detectives then went to the next room in the hallway, where a man and a woman were sleeping. The detectives woke the two and told them they were looking for the named people. The couple responded that they did not know the people who were being sought. The detectives told the couple that they had to look around the room and entered. The detectives looked under the bed and in the closet. The two people in the room were not the subjects of the warrant.
*385 The detectives went to the next room. They banged on the door to wake the person. A man, later identified as Carlos Diaz, opened the door. The detectives told Diaz their purpose for being there, the names of the people subject to the warrants, and showed him the photograph. Diaz said he did not know the three. The detectives said that they had to take a look around and entered the room. Gervase, now joined by Porette, entered the room, and saw a television that had money on it and a closet. The detectives looked under the bed and in the closet. The door to the closet was open because there was so much clothing both inside and outside of the closet. Despite the clothing, Gervase said he saw a clear plastic bag on the floor containing vials of crack. Diaz was arrested.
Gervase looked into the bathroom and the kitchen, but there was no one in either place. There was one more room, and the resident there was leaving for work. Gervase stopped him, explained why the police were there, said that they had warrants and told the man that they had to look around. The detectives entered the room, looked under the bed and in the closet and let the man leave because he was not the subject of the warrant.
None of the people at 4440 Park Avenue were black; the three people named in the warrants were not at 4440 Park Avenue. The property the police had seen was seized. Porette went to get a warrant.
4. The Search Warrant and the Supporting Affidavit
In his affidavit in support of the warrant to search rooms one and three of 4440 Park Avenue, Porette stated that he entered 4440 Park Avenue to execute arrest warrants C88410203, C88326798 and C76301960 and that he observed drugs and drug paraphernalia in rooms one and three. He did not inform the Judge before whom the warrant application was made that "C” meant the warrants were for misdemeanors, that 4440 Park Avenue was a dwelling, that rooms one and three were the homes of the people found in them, that the police had entered those rooms without a search warrant or that the observations of drugs and drug paraphernalia were made after entry into the rooms. Further, Porette requested a no-knock provision asserting there was a danger of destruction of the evidence, when he knew that police were in the building and the rooms.
*386 5. Property Found Pursuant to the Search Warrant
After the warrant was obtained, the police found in the defendant’s room a Tanita scale, 76 vials of crack in a knapsack in the closet and 600 vials of crack in a white bag also inside of the knapsack, a glass coffee pot containing alleged cocaine residue in a box on the T.V. stand, a shoebox containing four bundles of 60 vials of crack in the closet. In room three several guns, drugs and money were found. No fugitives were ever found.
FINDINGS AND CONCLUSIONS
Both the police entries into the defendant’s home, a room at 4440 Park Avenue, were unlawful. (CPL 690.05 [2] [b]; Steagald v United States, 451 US 204 [1981].) Consequently, the evidence must be suppressed.
Steagald (supra) holds that an arrest warrant for a person cannot be executed at the home of a third person without a search warrant authorizing the search of the home for the person who is the subject of the arrest warrant. If an arrest warrant is executed without the search warrant, evidence of other crimes found in the home cannot be used against a person with a privacy interest in the home.
The Criminal Procedure Law sets out the New York procedure for execution of bench warrants and implementation of Steagald (supra). A bench warrant is an arrest warrant for a person directing an officer to bring that person to court for any purpose other than arraignment. (CPL 1.20 [30].) It is executed in the same manner as an arrest warrant. (CPL 530.70 [2].) The officer executing the warrant may enter any premises in which he reasonably believes the subject of the warrant to be present. If the premises in which the officer reasonably believes the subject of the bench warrant to be present is the dwelling of another person, the officer must have a search warrant to enter to search for and arrest the subject of the warrant. That search warrant must designate the premises to be searched for the arrest of the person who is the subject of the bench warrant. The search warrant can be issued only if the bench warrant is for a person charged with a felony. (CPL 120.80, 690.05 [2] [b] [ij.)
In this case, the entry into the defendant’s home was a violation of both Steagald (supra) and New York’s statutory scheme. There was no reasonable belief that the three fugitives were at 4440 Park Avenue. One fugitive was last reported to have been there 19 years earlier; two others seven years earlier. No other *387 information was known about the three men or the building and no efforts were made by the officers to get other information. When Gervase arrived at 4440 Park Avenue he met the defendant, who told the police that the three fugitives did not live at 4440 Park Avenue and that he did not know them. Ger-vase knew immediately that the defendant was not the fugitive being sought, and Gervase provided no basis for doubting the representations made by the defendant in this face-to-face encounter.
The only other information that Gervase relied on to enter 4440 Park Avenue was a telephone call received by some unidentified member of the warrant squad from an unknown caller with a vague message that the person they were looking for was either at or living at 4440 Park Avenue. Gervase made no effort to get any other information about the call. According to Gervase the caller did not say who it was who was being looked for or why and did not explain the source of the information. If the call was made at all it provided only unverified and unreliable information. What is more, this court does not credit the testimony that the call was made. This court finds Gervase’s story about the call is a fabrication made up later to justify earlier unlawful conduct. There was no record of the call, and no notes about the call kept by any officer. The police had no reasonable basis to believe the three fugitives were at 4440 Park Avenue.
Further, the police could not enter room one to search for the fugitives because the room was defendant’s home. This is evident because each of the doors on the floor had separate numbers and a lock. The defendant returned to his room still in his nightclothes after opening the front door of the house to let the police in. His wife was still in bed as the police came to the door of their room. Despite this clear evidence that room one was the defendant’s home, the police entered the room to search it. They wrongfully entered because they did not have a search warrant to enter the defendant’s home to search for the subjects of the bench warrants.
Furthermore, they could not have obtained a search warrant for the defendant’s room because no information known by the police about the fugitives was specifically related to the defendant’s residence as opposed to the 4440 Park Avenue building as a whole. There was no specific, reliable information that gave a right to search the defendant’s room. What is more, a search warrant to search for a fugitive in the defendant’s home, or indeed in the home of anyone in 4440 Park Avenue, *388 was not permissible because the bench warrants were issued in cases involving a class A misdemeanor (petit larceny) and two violations (unlawful possession of marihuana and trespass) rather than for felonies as required by CPL 690.05 (2) (b) (i). Very simply, there was no way the officers could legally enter the defendant’s home.
The observations of drug paraphernalia in the defendant’s room were made after the officers entered that room unlawfully. The search warrant obtained to conduct a second search of room for drugs was the fruit of unlawful entry into the room. (People v Cirrincione, 207 AD2d 1031 [4th Dept 1994].) Although the officers conducted the search pursuant to a warrant, the Judge who issued the warrant was not given the information that would have shown that tainted information provided the basis of the application. The issuing court was misled into believing that the police had seen the empty vials and caps after they had lawfully entered on the authority of three arrest warrants. In fact, the bench warrants that were involved did not permit entry. Accordingly, the search warrant was not valid.
The motion to suppress is granted.

. After the evidentiary portion of the case was initially closed, this court examined the criminal court file of X604730 in an eifort to resolve a conflict in the evidence. On February 21, 1997, in court, the parties were told of the examination of the file by this court. They had no further argument.

. The March 22, 1995, date was based on the date printed on the first of a series of computer runs that Gervase made to get information about 4440 Park Avenue.

. According to Gervase, the warrant squad uses five classifications for bench warrants: (1) an R warrant is for a defendant charged with a Supreme Court felony; (2) a P warrant is for a defendant charged with a Supreme Court violation of probation; (3) a V warrant is for a defendant charged in a criminal court case with a violent felony; (4) a D warrant is for a defendant charged in a criminal court case with a nonviolent felony; (5) a C warrant is for a defendant charged with a misdemeanor.

. This is the file examined by the court to determine the charge for which the bench warrant was issued.